IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v | ) | CIVIL ACTION NO. |
| | ) | 2:04CV746-MHT-VPM |
| DARRELL SIMPSON | ) | [WO] |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This matter is before the court on a motion by federal inmate DARRELL SIMPSON

["Simpson"] to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

## I.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On 22 October 1996, a federal grand jury charged Simpson with unlawful distribution

of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and using and carrying a

firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C.

§ 924(c)(1).  On 2 January 1997, a superseding indictment expanded the charges against

Simpson, alleging the following drug and firearm counts:

> Count I – conspiracy to possess with intent to distribute cocaine
> base from 15 May 1996 through 15 November 1996, in
> violation of 21 U.S.C. §§ 841(a)(1) and 846;
>
> Count II – unlawful distribution of a controlled substance and
> aiding and abetting on 17 May 1996, in violation of 21 U.S.C.
> § 841(a)(1) and 18 U.S.C. § 2;
>
> Count III – unlawful distribution of a controlled substance and
> aiding and abetting on 23 May 1996, in violation of 21 U.S.C.
> § 841(a)(1) and 18 U.S.C. § 2;

> Count IV – using and carrying a firearm during and in relation
> to a drug trafficking crime on 23 May 1996, in violation of 18
> U.S.C. § 924(c)(1);
>
> Count V – unlawful distribution of a controlled substance on 12
> June 1996, in violation of 21 U.S.C. 841(a)(1); and
>
> Count VI – using and carrying a firearm during and in relation
> to a drug trafficking crime on 12 June 1996, in violation of 18
> U.S.C. § 924(c)(1).

Simpson and his counsel, Maurice S. Bell [-"Bell"], subsequently undertook plea negotiations with the government and reached a plea agreement based upon the following terms:

- in return for Simpson's guilty plea to Count III of the superseding indictment, the government would dismiss all other counts against Simpson at sentencing;

- "in excess of 5 grams of cocaine base" were attributable to Simpson's "personal participation in the offense of conviction," exposing Simpson to a statutory penalty of from 5 to 40 years in prison. *Plea Agreement* at p. 2; *see* 21 U.S.C. § 841(b)(1)(B)(iii);

- for purposes of determining Simpson's sentence, 60.9 grams of cocaine base were attributable to him based on his relevant conduct. *Id*. at p. 4; *see* U.S.S.G. § 1B1.3;

- if Simpson provided truthful information about his involvement in the offense, the government would recommend at sentencing that he receive a three-level reduction in his offense level for acceptance of responsibility. *Id*. at pp. 4-5;

2

*see* U.S.S.G. § 3E1.1.

On 21 March 1997, Simpson appeared with Bell before Judge Ira DeMent and entered a plea of guilty to Count III, as provided in the plea agreement.  During the plea colloquy, Simpson stated that he understood the terms of the plea agreement, that he understood the maximum penalty of 40 years, and that his counsel had explained the sentencing guidelines to him.  *See Change of Plea Hearing* at pp. 7-9.  Judge DeMent explained to Simpson that it was not possible to determine the final guideline range for Simpson's sentence until after the Probation Office completed a presentence investigation report ("PSI") and that Simpson would have an opportunity to object to the PSI when it was completed.  *Id*. at pp. 9-10.  Simpson affirmed to the court that he understood these matters.  *Id*.

After Judge DeMent explained Simpson's waiver of constitutional trial rights to him, the government recited the factual basis for Count III, i.e., that on 23 May 1996, Simpson sold approximately 20 grams of cocaine base to a confidential informant. *Change of Plea Hearing* at pp. 10-14.  Simpson pleaded guilty to having committed the acts recited by the government.  *Id*. at p. 15.  Judge DeMent then found that the factual basis for the guilty plea was adequate, that Simpson was aware of the consequences of his plea, and that the plea was knowingly and voluntarily entered.  *Id*.  He then accepted Simpson's plea and adjudged him guilty of Count III.  *Id*.

A sentencing hearing took place on 13 May 1997 before Judge David D. Dowd.[1]  As

---

[1]Judge Dowd, of the Northern District of Ohio, was sitting by assignment.

3

Judge Dowd recited the findings and recommendations in the PSI, Simpson's counsel, Bell, noted that the Probation Office had, upon Bell's objection, reduced Simpson's criminal history category from IV to III. *See Sentencing Hearing* at pp. 2-3. Finding that Simpson's criminal history was still overstated, Judge Dowd further reduced his criminal history to category II. *Id*. at pp. 3-4.

Bell then argued that Simpson's alleged possession of a gun during the drug offense should not, as recommended in the PSI, be used to enhance Simpson's offense level. *Id*. at p. 7. After hearing evidence on the issue, however, Judge Dowd found that the enhancement was merited. *Id*. at pp. 8-19. Applying to a base offense level of 32 the two-level enhancement for gun possession and a two-level enhancement for Simpson's role as an organizer in the offense,[2] and then subtracting three levels for Simpson's acceptance of responsibility, Judge Dowd found that Simpson's total offense level was 33. *Id*. at pp. 2, 6, and 19. When that offense level was combined with Simpson's criminal history category of II, Simpson's guideline range for his offense was 151-188 months. *Id*. at p. 19.

After informing Simpson of the guideline range, Judge Dowd asked him if he wished to say anything as to how the court should exercise its discretion within that range; the following exchange then occurred:

> THE DEFENDANT: Yes, Your Honor. I understand that you got your job to do, and I'm sorry for what I did, but I don't understand I'm about to do time for what somebody else has done. I understand let me do the time for what I have done, but to do time for what somebody else has done, I don't

---

[2]*See* U.S.S.G. §§ 2D1.1(b)(1) and 3B1.1(c).

understand.  Like I wish you would have been here the day when the plea agreement had came in, because the plea agreement was not read to me like you had read it to me.  It was not read to me the second time.  And they waived that, but they went on to what went on.

THE COURT:  Do you want to withdraw your plea?

THE DEFENDANT:  No, Your Honor.  I just want to – Okay.  On the 23rd of May, that's what I pled guilty to.  On the 23rd of May it says that twenty grams was sold, not sixty point nine.  And I'm about to do time for what somebody else done.  I'm guilty for what I done, I'm remorseful for that.

THE COURT:  The Court will vacate the guilty plea and let Judge DeMent take it from there.

The Court will be in recess.  I'm not going to sentence this man under the circumstances.

*Sentencing Hearing* at pp. 20-21.  Bell did not object to Judge Dowd's ruling vacating

Simpson's guilty plea *sua sponte*.

After Simpson's guilty plea was set aside, Bell was allowed to withdraw as Simpson's

counsel; Simpson then retained attorney Deborah M. Nickson ["Nickson"] to represent him

in further proceedings.  *See* Case No. 02:96CR195-TMH: Doc. Nos. 117-19.  Because the

guilty plea had been vacated, the government did not move to dismiss any of the charges

against Simpson, and all counts of the superseding indictment remained pending against him.

Simpson's case proceeded to a jury trial before Judge Truman M. Hobbs on 7 July

1998.  On 9 July 1998, the jury convicted Simpson on Counts I, III, IV, V, and VI of the

superseding indictment.  On 17 September 1998, the district court sentenced Simpson to a

total of 352 months in prison.  This sentence incorporated a downward departure from the

5

sentencing guidelines range, to which the government objected.

Simpson appealed, and the government cross-appealed, arguing that the district court abused its discretion in giving Simpson a downward departure on his sentence. On 29 September 2000, the Court of Appeals affirmed Simpson's convictions but vacated the district court's sentencing order and remanded the case for resentencing.[3] On 25 January 2001, the district court resentenced Simpson to a total of 488 months in prison. Simpson again appealed his sentence, and again, the Court of Appeals affirmed the sentence in an unpublished opinion issued on 14 March 2002. *United States v. Simpson*, No. 01-10472, 34 Fed.App.387 (11th Cir. Mar. 14, 2002) (table). The Supreme Court denied Simpson's petition for a writ of certiorari on 6 October 2003. *Simpson-Bey v. United States*, 540 U.S. 900 (2003).

On 29 July 2004, Simpson filed this § 2255 motion,[4] in which he asserts the following claims:

    1.    Bell rendered ineffective assistance by failing to object to Judge
          Dowd's *sua sponte* vacatur of his guilty plea.

    2.    Bell also rendered ineffective assistance by failing to (i) move
          to dismiss the superseding indictment based on lack of details

---

[3]*United States v. Simpson*, 228 F.3d 1294 (11th Cir. 2000). The Court of Appeals held that the district court's attribution of 744 grams of cocaine base to Simpson constituted plain error. In addition, the court held that the district court erred by applying the downward departure.

[4]Although Simpson's § 2255 motion was date-stamped "received" in this court on 4 August 2004, the court, under the "mailbox rule," deems his motion filed on the date he delivered it to prison authorities for mailing, presumptively, 29 July 2004, the day that he signed it. *See Houston v. Lack*, 487 U.S. 266, 271-72 (1988); *Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001).

set forth in the counts; (ii) file a bill of particulars; (iii) fully apprise Simpson of the strength of the government's case; (iv) file a motion for discovery of Simpson's statements; (v) file motions to obtain copies of all statements made by Simpson's codefendants; (vi) file motions for disclosure of the identity and statements of any other alleged coconspirator and any witnesses; (vii) file a motion for a list of the government's witnesses; and (viii) move for production of guideline sentencing information.

3.    Nickson rendered ineffective assistance by failing to inform him prior to trial that the government had renewed its offer of a plea agreement under the same terms as the original plea agreement.[5]

The government responded to Simpson's § 2255 motion, asserting that his claims do not entitle him to relief.   Simpson was afforded an opportunity to respond to the government's submission.  Upon review of the motion and pleadings filed in this case, the court determined that an evidentiary hearing was required on Simpson's claims concerning Bell's failure to object to Judge Dowd's ruling vacating Simpson's guilty plea and Nickson's alleged failure to communicate the government's renewed plea offer to Simpson.  The evidentiary hearing was held on 29 June 2006.  For the reasons that follow, the court concludes that Simpson's motion should be granted.

## II.  DISCUSSION

### A.    *Standard of Review for Ineffective Assistance of Counsel*

---

[5]For organizational and analytical purposes, the court's Recommendation recasts some of Simpson's claims in a more appropriate presentation.

The Sixth Amendment right to counsel exists to protect the fundamental right to a fair trial.  To succeed on a claim of ineffective assistance of counsel, a movant must satisfy both prongs of the test set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  The performance prong requires a movant to establish that counsel performed outside the wide range of reasonable professional assistance and made errors so serious that he failed to function as the kind of counsel guaranteed by the Sixth Amendment.  *Id*. at 687-89.  The prejudice prong requires a movant to demonstrate that seriously deficient performance of his counsel prejudiced the defense.  *Id*. at 687.

Under the performance component of the *Strickland* inquiry, a movant must establish that his attorney's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Id*.  In other words, criminal defendants have a Sixth Amendment right to "reasonably effective" legal assistance.  *Roe v. Flores-Ortega*, 528 U.S. 470, 476 (2000) (quoting *Strickland*, 466 U.S. at 687).

There is a strong presumption that counsel's performance was reasonable and adequate, and great deference is shown to choices dictated by reasonable trial strategy. *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994); *see Strickland*, 466 U.S. at 689.  Review of an ineffective assistance of counsel claim is conducted from the perspective of defense counsel, based on facts "as they were known to counsel *at the time of the representation*." *United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir. 1992) (emphasis in original); *see*

8

*Strickland*, 466 U.S. at 690.

The prejudice component of *Strickland* focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *See Strickland*, 466 U.S. at 687.  Unreliability or unfairness is not established if counsel's assistance did not deprive the defendant of any constitutionally protected right. *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000).  To establish prejudice, a movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" *Strickland*, 466 U.S. at 694.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Unless a movant satisfies the showings required on both prongs of the *Strickland* inquiry, relief should be denied.  *Strickland*, 466 U.S. at 687.  Accordingly, once a court decides that one of the requisite showing has not been made, it need not decide whether the other one has been.  *Id*. at 697 (A court need not "address both components of the inquiry if the [movant] makes an insufficient showing on one."); *Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998) ("if a defendant cannot satisfy the prejudice prong, the court need not address the performance prong").

## B.    *Ineffective Assistance of Counsel Claims*

### 1.    *Sua Sponte* **Vacatur of Guilty Plea**

Simpson contends that his guilty plea counsel, Bell, rendered ineffective assistance

by failing to object to Judge Dowd's *sua sponte* vacatur of his guilty plea during his sentencing hearing. (Doc. No. 1 at pp. 27-31.) Simpson argues that Judge Dowd lacked the authority to vacate the guilty plea upon his own initiative.

Once the district court accepts a defendant's guilty plea, the conditions under which the plea may be withdrawn are governed by FED.R.CRIM.P. 11(d).[6] Rule 11(d) permits the withdrawal of a guilty plea only upon the initiative of the defendant. *United States v. Cannon*, 807 F.2d 1528, 1529 (11th Cir. 1986) (construing former FED.R.CRIM.P. 32(d), now codified as Rule 11(d)). Accordingly, once the district court has accepted a guilty plea, it lacks the authority to vacate the plea *sua sponte*. *Cannon*, 807 F.2d at 529; *see also Ellis v. United States Dist. Court*, 356 F.3d 1198, 1207-09 (9th Cir. 2004) (en banc); *United States.*

---

[6]At the time of Simpson's guilty plea proceedings, the former version of FED.R.CRIM.P. 32(e) governed withdrawal of guilty pleas after acceptance of a plea agreement but before sentencing. In December 2002, former Rule 32(e) was moved to FED.R.CRIM.P. 11; the rule is currently codified as Rule 11(d). For ease of reference, Rule 11(d) is cited in this Recommendation. In pertinent part, Rule 11(d) provides:

> A defendant may withdraw a plea of guilty or nolo contendere:
>
> ....
>
> (2) after the court accepts the plea, but before it imposes sentence if:
>
>> (A) the court rejects a plea agreement under Rule 11(c)(5); or
>>
>> (B) the defendant can show a fair and just reason for requesting the withdrawal.

FED.R.CRIM.P. 11(d)(2)(A) & B.

*v. Patterson*, 381 F.3d 859, 864-65 (9th Cir. 2004).

At the evidentiary hearing, Simpson was adamant that it was never his intention to withdraw his guilty plea. (Hr'g at 9:47:14; 9:54:22.[7]) He maintained that the objections he recited at the sentencing hearing before Judge Dowd were the result of his failure to understand that, under the "relevant conduct" provisions of the sentencing guidelines, he could, for sentencing purposes, be held accountable for quantities of drugs in addition to the drug amounts involved in the offense to which he pleaded guilty. (Hr'g at 9:49:05; 9:54:00.)

Simpson stated that by objecting, he was attempting to get this issue "on the record" for appeal. (Hr'g at 9:54:15; 10:18:10.) He indicated that he also objected in order to preserve for appellate review the appropriateness of his sentence enhancements for gun possession and his role in the offense. (Hr'g at 9:51:00; 9:54:00 - 9:54:20; 10:18:10.) According to Simpson, he informed Bell prior to sentencing that he wanted to object to these matters. (Hr'g at 9:56:24.)

Simpson acknowledged that the 60.9 grams of cocaine base attributed to him for his relevant conduct was referenced in the written plea agreement and explained in the PSI. (Hr'g at 9:55:35 - 9:56:00.) However, he maintained that at the time of the plea proceedings, he had a low-level reading ability and was ashamed to tell Bell or other officers of the court that he could not read and was unable to understand the plea agreement and PSI fully. (Hr'g

---

[7]Citations to testimony refer to the time, or approximate time, the testimony occurred during the evidentiary hearing.

at 9:52:20 - 9:52:43; 10:13:55 - 10:14:06.)

For his part, Bell had no specific recollection of Simpson's guilty plea or sentencing hearing or of the circumstances under which Simpson's guilty plea came to be vacated.  It does not appear that Bell consulted with Simpson following vacatur of the guilty plea to discuss the possibility of moving for reinstatement of the plea or that Bell otherwise explained the consequences of the vacatur to Simpson.

Simpson's contention that, by objecting at sentencing before Judge Dowd, he was not seeking to withdraw his guilty plea is supported by the transcript of the sentencing hearing. When Judge Dowd asked Simpson directly if he wished to withdraw his plea, Simpson answered   - just as directly -   that he did not want to withdraw his guilty plea. *Sentencing Hearing* at p. 21.  Simpson continued to object specifically to the attribution of 60.9 grams of cocaine base to him when the transaction to which he had pleaded guilty involved the sale of only 20 grams of the drug.  *Id*.  This court finds that a fair reading of the exchange between Simpson and Judge Dowd supports the conclusion that Simpson did not move to withdraw his guilty plea.

In the absence of a motion by Simpson to withdraw the plea or any indication of Simpson's consent to the plea's vacatur, Judge Dowd was not authorized to vacate Simpson's guilty plea. *Cannon*, 807 F.2d at 529; Fed.R.Crim.P. 11(d).  Thus, the court finds that, under the circumstances, Bell's failure to object to Judge Dowd's actions and to move to reinstate Simpson's guilty plea fell below the level of "reasonably effective" legal

assistance mandated by the interpretation of the Sixth Amendment right.[8]  *See Strickland v. Washington*, 466 U.S. 668, 687-89 (1984); *Roe v. Flores-Ortega*, 528 U.S. 470, 476 (2000).

While the government has taken no position regarding the propriety of Judge Dowd's actions or Bell's failure to object to the *sua sponte* vacatur of Simpson's guilty plea, it maintains that Simpson is unable to establish any prejudice attributable to Bell's actions because Simpson subsequently had an opportunity to re-enter a guilty plea under the terms of the original plea agreement, but declined to do so.  The government contends that, prior to his trial, Nickson advised Simpson that the government had renewed its offer of a plea agreement under the same terms as the original plea agreement, but Simpson rejected the offer and insisted upon going to trial.  Accordingly, the government argues that any harm Simpson suffered was not ultimately attributable to Bell's performance, but rather was the result of Simpson's own choice to reject the plea offer and proceed to trial.

Simpson contends that the government's argument is unavailing because, as discussed below, he maintains that Nickson did not inform him that the government had offered to accept a guilty plea under the same terms as the original agreement.  Thus, Simpson argues that Bell's ineffective assistance was not "cured" by subsequent events and was in fact

---

[8]In his motion, Simpson asserts several additional allegations of ineffective assistance by Mr. Bell prior to and during the guilty plea proceedings.  Although Simpson maintains that these instances of deficient performance by Mr. Bell somehow ultimately contributed to the vacatur of his guilty plea by Judge Dowd, Simpson demonstrates no plausible nexus between the alleged instances of deficient performance and Judge Dowd's ruling setting aside his guilty plea.  Simpson's failure to establish prejudice forecloses any relief based on these other allegations of Mr. Bell's ineffective assistance of counsel.

compounded by Nickson's own ineffective assistance.

2.      **Failure to Communicate Plea Offer**

Simpson contends that he received ineffective assistance of counsel when Nickson failed to inform him prior to trial that the government had renewed its offer of a plea agreement under the same terms as the original plea agreement.  (Doc. No. 12 at 5.)

> "Counsel has an obligation to consult with his client on important decisions and to keep him informed of important developments in the course of the prosecution.  *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, L.Ed.2d 674 (1984).  *See also Johnson v. Duckworth*, 793 F.2d 898, 902 (7th Cir.), *cert. denied*, 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986) (client must be involved in decision to accept or reject plea offer, and failure to inform client of offer constitutes ineffective assistance)."

*Diaz v. United States*, 930 F.2d 832, 834 (11th Cir. 1991).  *See also Boria v. Keane*, 99 F.3d 492, 497-98 (2nd Cir. 1996) (failure of counsel to discuss with defendant whether to accept or reject plea offer constitutes ineffective assistance); *United States v. Blaylock*, 20 F.3d 1458, 1466-68 (9th Cir. 1994) (attorney's failure to communicate government's plea offer to defendant satisfied first part of *Strickland* test; remanded for evidentiary hearing on whether defendant would have accepted plea offer); *United States ex rel. Caruso v. Zelinsky*, 689 F.2d 434, 438 (3rd Cir. 1982) ("decision to reject a plea offer ... is a decision for the accused to make," and failure of counsel to advise client of plea offer constitutes ineffective assistance); *Beckham v. Wainwright*, 639 F.2d 262, 267 (5th Cir. 1981) (where the issue is

whether to advise the client to plead or not, "the attorney has the duty to advise the defendant of the available options and possible consequences" and failure to do so constitutes ineffective assistance of counsel).

At the evidentiary hearing, Simpson acknowledged that on the day his trial was scheduled to start, Nickson informed him that the government had offered him a plea. However, when he then asked Nickson, "What did they say?", she replied, "Don't even worry about it, because I know you're not going to accept it." (Hr'g at 10:00:00 - 10:00:07.) According to Simpson, until he read Nickson's affidavit filed in connection with these § 2255 proceedings, he "never knew" that the government had in fact renewed its offer of a plea agreement under the same terms as the original agreement.[9] (Hr'g at 10:00:08 - 10:00:35; 10:02:38.)

In his testimony, Simpson insisted that, had he known the original plea offer was back on the table, he would have taken it. (Hr'g at 10:02:54 - 10:03:15.) He stated that he never wanted to go to trial because he believed that he had no chance for an acquittal, particularly after viewing videotapes that showed him taking part in the drug transactions. (Hr'g at 9:59:09.) Simpson testified that when he asked Nickson how any defense could be presented in light of the videotapes, she told him "don't worry about the tapes," and assured him that she could get them excluded from evidence based on a defect in the chain of custody. (Hr'g

---

[9]In his testimony at the evidentiary hearing, Simpson did not indicate whether he and Ms. Nickson discussed the possibility of a plea offer from the government at any other time during her representation of him.

15

at 9:59:00; 9:59:48.)

Simpson maintained that he had not seen the videotapes while he was represented by Bell, but that Nickson obtained the videotapes from the government and showed them to him approximately two weeks before his trial began.  (Hr'g at 9:58:50; 10:16:05.)  To bolster his claim that he would have accepted the renewed offer of the plea agreement if he had been made aware of it, he argued that since he had been willing to plead guilty without viewing the highly incriminating tapes, he would have been "a fool" to turn down the same plea offer and go to trial after actually viewing the tapes.  (Hr'g at 10:16:20 - 10:16:25.)  According to Simpson, he was so certain that he could not win at trial that he told Nickson that because he was being "forced" to go to trial, he wanted to take the stand and admit his guilt by telling the jury that he had previously pled guilty.  (Hr'g at 9:59:16 - 9:59:45.)

Nickson's version of the facts was markedly different from Simpson's.  She testified that after she was retained by Simpson, the government advised her that it was willing to offer Simpson a plea agreement under the same terms as the original plea agreement.  (Hr'g at 10:54:12 - 10:54:32.)  She stated that she then spoke to Simpson at the jail and informed him that the government was offering him a plea agreement under the original terms.  (Hr'g at 10:54:06 - 10:54:10.)  She stated that she advised Simpson to take the plea agreement at that time, but he rejected it.[10]  (Hr'g at 10:54:00 - 10:54:48.)  According to Nickson,

---

[10]It is unclear from Nickson's testimony how soon after she was retained that the government advised her that it was willing to re-offer Simpson the original plea agreement.  Nor is the approximate date on which she relayed this information to Simpson at the jail apparent from her testimony.

Simpson told her that he did not want to plead guilty because he did not want to serve any time in prison and that he wanted, at most, only probation.  (Hr'g at 10:55:42 - 10:55:55.) She testified that Simpson indicated to her that he feared for his family's safety if he were to plead guilty and be labeled a "snitch."  (Hr'g at 10:58:00 - 10:58:28.)

Nickson testified that, from shortly after the time she was retained to the day of trial, she discussed a plea with Simpson and advised him to plead guilty, but that Simpson consistently stated he was not willing to plead guilty  (Hr'g at 10:25:35 - 10:27:56; 10:35:55 - 10:36:56; 10:55:42 - 10:55:55; 11:00:04 -11:00:33.)  She stated that Simpson insisted on going to trial, against her advice, even after viewing the videotapes showing his participation in the drug transactions.  (Hr'g at 10:25:35 - 10:27:54.)  She indicated that she had no recollection of Simpson ever telling her that he wanted to take the stand to admit his guilt to the jury.  (Hr'g at 10:39:42 - 10:39:53.)

Nickson testified that after she investigated Simpson's case, she was convinced that if he went to trial, he would be convicted.  (Hr'g at 10:40:46.)  However, because Simpson insisted on going to trial, she discussed trial strategy with him.  (Hr'g at 10:43:08 - 10:43:11.)  She stated that Simpson "felt very strongly" that the informant to whom he had sold the drugs, and whom Simpson called his "cousin," would not appear at trial to testify against him.  (Hr'g at 10:43:13 - 10:43:20; 10:56:30 - 10:56:46.)  She stated that if the informant did not show up at trial, there would be a problem with the chain of custody of the

17

drug evidence, making it difficult for the government to obtain a conviction.  (Hr'g at 10:44:40 - 10:45:00.)  Thus, the trial strategy that developed depended largely on the nonappearance of the informant   -   an eventuality as to which Nickson had no prior verification.  The informant appeared and testified against Simpson at trial.  (Hr'g at 10:43:38; 10:44:45.)

Nickson stated that she never told Simpson that she had a plan to get the videotape evidence excluded at trial on chain of custody grounds; she stated that any chain of custody argument was going to be based on the informant's absence from trial.  (Hr'g at 10:46:09 - 10:46:31.)  On cross-examination, Nickson testified that she did not recall telling Simpson that she planned to challenge the chain of custody evidence on the ground that the forensic analyst who tested the drugs was recently deceased and therefore could not testify at trial. (Hr'g at 10:46:45.)  Nor could she remember filing a chain of custody motion at trial.[11] (Hr'g at 10:47:16.).

Nickson testified that on the morning of Simpson's trial, Judge Hobbs met with her and the federal prosecutor in his chambers and told her to discuss the government's plea offer with Simpson "one more time" and to tell Simpson that if he wished to accept the

---

[11]Notwithstanding Nickson's failure to recall this matter, the trial record reflects that on 9 July 1998,  Nickson presented an oral motion in open court to strike the drug evidence on chain of custody grounds. *Trial Transcript* at p. 275.  Earlier in the proceedings, Nickson had challenged the admission of the drug evidence based on the non-availability of the forensic analyst to testify at trial, *id*. at pp. 143-46; although Nickson did not expressly state as much to the trial court, it appears that her "chain of custody" motion was intended to incorporate the arguments she had previously made regarding the forensic analyst's failure to testify.  The trial court denied the "chain of custody" motion. *Id*. at p. 275.

government's offer, he could enter a guilty plea that morning.  (Hr'g at 10:29:30 - 10:30:19.)
During this meeting, the federal prosecutor affirmed that the government was still willing
to offer Simpson a plea agreement under the original terms.  (Hr'g at 10:32:10 - 10:32:28.)

According to Nickson, when she relayed this information to Simpson, who was sitting
in the courtroom, Simpson hesitated for a few moments and then "hit his hand on the table"
and told her to "go for it," meaning that he wanted to go to trial.  (Hr'g at 10:30:20 -
10:30:54.)  Ms. Nickson testified that she distinctly remembered telling Simpson during this
exchange that the terms of the original plea agreement were still on the table.  (Hr'g at
10:34:05 - 10:34:12.)

Finally, Ms. Nickson testified that she did not recall the exchange, recounted by
Simpson in his testimony, in which she spoke to Simpson in his holding cell just before trial
and purportedly told him not to worry about the contents of the government's plea offer
because she knew he would not accept it.  (Hr'g at 10:42:28 - 10:42:47.)

This court is required to conduct a credibility determination, which includes looking
to the internal consistency of the witnesses' testimony and their candor and demeanor on the
stand.  *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).  The
credibility determination cannot be based solely on the status of Simpson, who is now a
convicted felon.  Rather, the court must weigh his testimony, taking into account the interest
which he has, the consistencies or inconsistencies in his testimony, and his demeanor on the
stand.  *Id*.

Although Nickson's testified about a broad range of conversations and events surrounding the trial and her representation of Simpson, for purposes of resolving Simpson's claims, the critical issues of disputed fact are whether Nickson advised Simpson that the government's plea offer remain unchanged on the day of trial and whether Simpson rejected the offer by stating his intent to go to trial.  Having observed the witnesses, and having evaluated their testimony for consistency and the feasibility and believability of the propositions advanced, the court finds that Simpson's version is the more credible one on the aforementioned two issues.

While it is true that Simpson has an obvious interest in promoting his own version of the facts, Nickson is not without the same motivation, since the challenge runs essentially to the adequacy of her professional services.  In assessing credibility, however, the court has given no particular weight to the passage of time, since both witnesses were testifying to the events that occurred nearly eight years earlier.  In any case, there are several reasons why the court finds Simpson more credible on the critical issues.

First, although Nickson was certain that she had fully advised Simpson about the government's plea offer, her testimony lacked specific factual recollections about certain matters.  She could not remember their exchange in his holding cell prior to the trial. Nickson never testified that she did not meet with Simpson there; she merely stated that she didn't remember the conversation  -  any conversation.

Second, Nickson's testimony that Simpson did not want to plead guilty under the

same "deal" is not credible.  Indeed, before she was appointed to represent him, *__he had__*
*__already entered a plea of guilty__*, and he had advised the presiding judge that he did not wish
to withdraw his plea.  Her testimony that Simpson adamantly rejected the same deal that he
had previously taken   - without reciting any aggravating circumstances -   is difficult, at
best, to accept.

Third, Nickson's recollection of the events surrounding her trial strategy was muddled
and unreliable.  If the court accepts Nickson's representation that Simpson consistently
rejected the idea of entering a plea of guilty, then the court must conclude that Nickson spent
virtually all of her time preparing for trial.  Yet, Nickson appears to have had a quite dubious
trial strategy.  For example, although she appears to have grounded a major portion of her
trial strategy in the non-appearance of Simpson's cousin, the informant, she apparently failed
to investigate or make any other effort to ascertain whether he would in fact appear at trial.
There is no evidence that she asked the government's counsel, sought to speak with the
informant (whose identity she apparently knew), or sought to speak with anyone else who
might have known.  Either Nickson did not really leave such an important matter to chance,
suggesting that she took her representation seriously, or she did, suggesting that the
adequacy of her representation might be otherwise questioned.

Fourth, although Nickson was subpoenaed to testify at the evidentiary hearing, she
appeared to have been unprepared to testify about matters of record at Simpson's trial.  She
stated, for example, that she could not recall advising Simpson that she planned to challenge

21

the chain of custody of the drug evidence and she could not recall filing a chain of custody motion.  However, the trial record clearly discloses that she make such a motion.

It is not unfair to characterize Nickson's recollection as selective.  Even in the instances in which Simpson's recollection is not inconsistent with her own, she does not recall the events related by Simpson.  Simpson's recollections, on the other hand, are clear and concise.  While the court is mindful of the probability that these matters have consumed much of Simpson's time and attention for the past several years, juxtaposed against Nickson's many client encounters during the same period, Nickson's failure to avail herself of the record of the trial and her own client file dilutes her credibility.

The court reluctantly agrees with Simpson that, having entered a plea of guilty under an agreement with the government without seeing himself on a videotape, he would have been most imprudent   - if not a "fool" -   to have rejected a plea deal after viewing the videotapes   -  videotapes certain to be shown to the jury that would hold his fate in its hands.

Even if the court had serious doubts about Simpson's version of the facts   - and it does not -   and though neither side has advanced arguments on this point, a matter reasonably regarded as the death knell to the efficacy of Nickson's representation still lingers.  If Bell's failure to object to Judge Dowd's sua sponte rejection of Simpson's plea fell below the level of "reasonably effective" legal assistance mandated by the interpretation of the Sixth Amendment right, so did Nickson's.  After all, when she filed her Notice of

Appearance on 30 June 1997 (See Doc. # 118, 2:96CR195-TMH), the transcripts of Simpson's guilty plea colloquy, conducted on 21 March 2997 (See Doc. # 104), and other record documents, were fully available for her review.   That Nickson, like Bell, failed to object to the court's withdrawal of the guilty plea  - at least for the purpose of determining whether it was warranted -   could reasonably be construed as offensive to the Sixth Amendment.

For all of these reasons, the court thus finds that Nickson's representation, like Bell's representation, was deficient.


## III.  CONCLUSION

Remedies for the deprivation of the Sixth Amendment right to the effective assistance of counsel "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981).  Simpson does not complain of inadequate representation during trial. Instead, he claims that his counsel's misconduct cost him the opportunity to accept and benefit from the government's plea offer, the same plea offer that he had originally accepted. Consequently, "[o]ne more fair trial, or even a series of them, would not necessarily revive the lost chance." *Turner v. Tennessee*, 858 F.2d 1201, 1208 (6th Cir. 1988) (quoting *State v. Kraus*, 397 N.W.2d 671, 674 (Iowa 1986)).  *See also United States v. Blaylock*, 20 F.3d 1458, 1468-69 (9th Cir. 1994); *United States ex rel. Caruso v. Zelinsky*, 689 F.2d 434, 438

(3ʳᵈ Cir. 1982).

The Supreme Court has indicated that specific performance of a plea agreement is a constitutionally permissible remedy. *Mabry v. Johnson*, 467 U.S. 504, 510 n. 11 (1984); *Santobello v. New York*, 404 U.S. 257, 263 (1971). In the instant case, because Simpson was deprived of the opportunity to accept a plea offer, the only means by which to restore Simpson to his position prior to the Sixth Amendment violations is to require the government to reinstate the original offer.

> Requiring the government to reinstate its original offer would also accommodate the policy articulated by the Supreme Court in *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), where the Court held that "[t]he Constitution constrains our ability to allocate as we see fit the cost of ineffective assistance. The Sixth Amendment mandates that the State [or the government] bear the risk of constitutionally deficient assistance of counsel." *Id.* at 379, 106 S.Ct. at 2585. Under *Kimmelman*, even if one might perceive that the government's competing interest might be infringed by requiring that the original offer be reinstated, a contrary result would impermissibly shift the risk of ineffective assistance of counsel from the government to [the defendant].

*Blaylock*, 20 F.3d at 1469.

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the court enter an order

1.    GRANTING Simpson's 28 U.S.C. § 2255 motion to vacate his sentence of 352 months, imposed on 17 September 1998;

2.    DIRECTING the government to reinstate its original offer to Simpson, the

result of which would presumably reduce his sentence to 150-188 months;

3.    RE-SENTENCE Simpson, upon his plea of guilty to Count III of the indictment, in a manner consistent with the plea agreement and the Presentence Investigation Report.[12]

It is further

ORDERED that the parties shall file any objections to this Recommendation on or before 16 October 2006. A party must specifically identify the findings in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's proposed findings and recommendations shall bar a party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*).

If the government does not object to a reinstatement of the original plea offer, counsel for the government is DIRECTED to file a Notice of its willingness to do so on or before 16 October 2006.

_____

[12]Even if the court adopts this Recommendation, Simpson will not be released from prison. He has served less than 150 months in prison.

25

Done this 2nd day of October, 2006.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE